IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| WHITE BUFFALO ENVIRONMENTAL, INC., an Oklahoma corporation,<br><br>        Plaintiff,<br><br>v.<br><br>HUNGRY HORSE, LLC, a New Mexico limited liability company, NATALIE GLADDEN, KATHY RIVERA, HERIBERTO "EDDIE" GAYTAN, JR., DAKOATAH MONTANEZ, and LINDSAY SALGADO,<br><br>        Defendants. | Case No. 20-CV-00461-GKF-JFJ |

**OPINION AND ORDER**

This matter is before the court on the Motion to Dismiss for Lack of Personal Jurisdiction [Doc. 7] filed by all defendants. Plaintiff White Buffalo Environmental, Inc. opposes the motion. The court must decide whether it has personal jurisdiction over the defendants, and if it does not, whether it should transfer the case. After consideration, the court agrees with the defendants, grants their motion, and transfers the case to the United States District Court for the District of New Mexico.

**I. Background**

White Buffalo alleges the following in its Complaint: White Buffalo is an environmental consulting firm organized under the laws of Oklahoma and with its principal place of business in Tulsa County, Oklahoma. [Doc. 2, pp. 1–2 ¶¶ 1, 10]. Steve McFarlin is the President of White Buffalo. [*Id.* p. 2 ¶ 10]. White Buffalo became familiar with defendant Natalie Gladden in 2018 through work it was providing in Odessa, Texas. [*Id.* pp. 2–3 ¶¶ 11–12]. McFarlin hired Gladden

in April 2018 and agreed to open a White Buffalo office in Hobbs, New Mexico that Gladden would manage. [*Id.* p. 3 ¶¶ 13–14]. In August 2018, Gladden hired defendant Kathy Rivera to work in the Hobbs office. [*Id.* p. 3 ¶ 14]. Although Gladden was successful at adding clients and work, leading to an increase in sales for the Hobbs office, the office appeared to not generate a profit because of expenses. [*Id.* p. 3 ¶ 15].

"At some point prior to June 1, 2019, . . . Gladden decided to conspire with [defendant] Hungry Horse through Jerry Brian [], an employee of Hungry Horse, and to move all or substantially all of the files, customers, and property of White Buffalo to Hungry Horse, and close down the operations of White Buffalo's Hobbs office." [*Id.* p. 4 ¶ 17]. "White Buffalo was unaware of the activities of Gladden, Hungry Horse, and Brian, and any efforts to move all or substantially all of the files, customers, and property of White Buffalo to Hungry Horse was not authorized by White Buffalo." [*Id.* p. 4 ¶ 17].

In furtherance of this conspiracy, Brian visited White Buffalo's Hobbs office on May 31, 2019 under the auspices that he was there to provide training, but instead he informed White Buffalo's employees that they were "going over to Hungry Horse." [*Id.* p. 4 ¶ 18]. That same day, a White Buffalo crew supervisor, defendant Heriberto Gaytan Jr. ("Eddie Jr."), and his entire crew quit and "joined Hungry Horse to work jobs that would have been with White Buffalo but for Gladden having moved the jobs to Hungry Horse[] while she was still employed by White Buffalo." [*Id.* p. 4 ¶ 19]. After Eddie Jr. quit, defendant Lindsay Salgado emailed him information about another White Buffalo client so it could be transferred to Hungry Horse. [*Id.* pp. 5–6 ¶ 24]. On June 3, 2019, Gladden told a job seeker, Frankie Griggs, that "the Hobbs office of White Buffalo was ceasing operations and moving to Hungry Horse." [*Id.* p. 5 ¶ 21]. On June 12, 2019, Gladden emailed McFarlin and told him that Eddie Jr. and his crew had quit that day. [*Id.* p. 5

¶ 22].  On June 17, 2019, Gladden informed McFarlin that Rivera had quit White Buffalo.  [*Id.* p. 5 ¶ 23].  That same day, Rivera helped defendant Dakoatah Montanez and other White Buffalo employees dispose of thousands of White Buffalo's soil samples from the Hobbs' office.  [*Id.* p. 6 ¶ 25].

McFarlin, suspicious that "timesheets were being padded" and by all of the employee departures, traveled to Hobbs on June 20, 2019 with a business consultant and two of White Buffalo's Tulsa employees.  [*Id.* p. 6 ¶ 26].  McFarlin noticed the Hobbes office "looked like it had been 'cleaned,' as there was no work clutter and the shop area, where soil samples, tools, and equipment were stored, was completely empty but for a few tools."  [*Id.* p. 7 ¶ 27].  While in New Mexico, McFarlin interviewed candidates to audit the Hobbes office.  [*Id.* p. 7 ¶ 29].  Coincidentally, one of the candidates was Griggs, who informed McFarlin about her conversation with Gladden where Gladden told her all operations were being moved from White Buffalo to Hungry Horse.  [*Id.* p. 7 ¶ 29].

On June 21, 2019, Gladden informed McFarlin that she and the other remaining White Buffalo employees were quitting, and they were taking three of White Buffalo's clients with them.  [*Id.* p. 7 ¶ 30].  While the employees who quit packed up their belongings, Eddie Jr. and Montanez drove White Buffalo's John Deere front-end loader away from the Hobbes office.  [*Id.* pp. 7–8 ¶¶ 30–31].  Since the departure of the Hobbes office's staff, White Buffalo has audited the office and "uncovered evidence of timesheet fraud and embezzlement, theft of equipment, theft/destruction of soil samples, theft of company files, and conspiracy to divert business to Hungry Horse."  [*Id.* p. 8 ¶ 32].

White Buffalo brings the following counts against the following defendants:

- Count I: Breach of Fiduciary Duty—Gladden

- Count II: Breach of Duty of Loyalty—all individual defendants[1]
- Count III: Unjust Enrichment—all individual defendants
- Count IV: Conversion—all defendants
- Count V: Tortious Interference with Business Relations—Hungry Horse and Gladden
- Count VI: Conspiracy—all defendants

[*Id.* pp. 8–12 ¶¶ 33–50]. White Buffalo alleges that Hungry Horse is a limited liability company organized under the laws of New Mexico and that its principal place of business is Lea County, New Mexico. [*Id.* p. 2 ¶ 2]. In addition, it alleges that all of the individual defendants are residents of New Mexico, with the exception of Salgado who is a resident of Texas. [*Id.* p. 2 ¶¶ 2–7].

In their motion, all defendants argue that this court cannot exert personal jurisdiction because they do not have sufficient minimum contacts with Oklahoma. [Doc. 7]. White Buffalo disagrees; White Buffalo argues that Gladden and Hungry Horse have sufficient minimum contacts, and that this court can exert jurisdiction over the remaining defendants because they were co-conspirators with Gladden and Hungry Horse. [Doc. 12]. Alternatively, should the court agree with the defendants, White Buffalo requests that the case be transferred to the United States District Court for the District of New Mexico. [*Id.* pp. 19–20]. The defendants do not object to the case being transferred rather than dismissed. [Doc. 13, p. 1 n.1].

**II. Legal Standard**

**A. Federal Rule of Civil Procedure 12(b)(2) Standard**

In considering a motion to dismiss pursuant to Rule 12(b)(2), a court must determine whether the plaintiff has alleged sufficient facts to establish the court's personal jurisdiction over the defendant. *See* Fed. R. Civ. P. 12(b)(2). A plaintiff bears the burden of establishing that the court has personal jurisdiction over all defendants. *Dental Dynamics, LLC v. Jolly Dental Grp., LLC*, 946 F.3d 1223, 1228 (10th Cir. 2020). However, where, as here, the question of personal

---

[1] The individual defendants means all of the defendants except for Hungry Horse.

jurisdiction is disputed in the preliminary stages of litigation, "the plaintiff need only make a *prima facie* showing of jurisdiction to defeat the motion [to dismiss]." *AST Sports Sci., Inc. v. CLF Dist. Ltd.*, 514 F.3d 1054, 1056 (10th Cir. 2008). The plaintiff may make this *prima facie* showing by demonstrating, via affidavit or other written materials, facts that if true would support jurisdiction over the defendant. *Id.* at 1057. The court will accept as true the allegations in a plaintiff's complaint, and all factual disputes will be resolved in the plaintiff's favor. *Intercon Inc. v. Bell Atl. Internet Sols.*, 205 F.3d 1244, 1247 (10th Cir. 2000) (quoting *Wenz v. Memery Crystal*, 55 F.3d 1503, 1505 (10th Cir. 1995)).

"To show personal jurisdiction over a nonresident in a diversity action, [the plaintiff] must demonstrate that jurisdiction is proper under the laws of the forum state—in this case Oklahoma—and that the exercise of jurisdiction complies with the Due Process Clause of the Fourteenth Amendment." *Dental Dynamics*, 946 F.3d at 1228 (citing *Walden v. Fiore*, 571 U.S. 277, 282 (2014)). "Oklahoma's long-arm statute authorizes courts to 'exercise jurisdiction on any basis consistent with the Constitution of this state and the Constitution of the United States.'" *Id.* at 1229 (quoting Okla. Stat. tit. 12, § 2004(F)). As neither party raises any objection based on the Oklahoma constitution, "the analysis collapses into a single due process inquiry." *Id.* (citing *Old Republic Ins. Co. v. Cont'l Motors, Inc.*, 877 F.3d 895, 903 (10th Cir. 2017); *Newsome v. Gallacher*, 722 F.3d 1257, 1264 (10th Cir. 2013)).

The Due Process Clause authorizes personal jurisdiction if two elements are met. "First, a defendant must have 'purposefully established minimum contacts within the forum state.'" *Id.* (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). "Second, the assertion of personal jurisdiction must comport with traditional notions of fair play and substantial justice." *Id.* (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985)).

5

The "minimum contacts" standard can be satisfied in either of two ways: first, the court may exert specific jurisdiction over a defendant who has "purposefully directed his activities at residents of the forum," provided "the litigation results from alleged injures that arise out of or relate to those activities." *Benton v. Cameco Corp.*, 375 F.3d 1070, 1075 (10th Cir. 2004) (internal citations and quotation marks omitted). Alternatively, the court may maintain general personal jurisdiction over a defendant who has maintained continuous and systematic general business contacts with the forum state. *Id.*

Even if the minimum contacts test is met, the court must "assess whether exercising personal jurisdiction would offend traditional notions of fair play and substantial justice." *Dental Dynamics*, 946 F.3d at 1229 (citing *Old Republic*, 877 F.3d at 909). To do so, the court considers the following factors: "(1) the burden on the defendant; (2) the forum state's interest in resolving the dispute; (3) the plaintiff's interest in receiving convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states in furthering fundamental social policies." *Id.* (citing *Old Republic*, 877 F.3d at 909). A defendant's showing under these factors operates on a "sliding scale." *AST Sports Sci.*, 514 F.3d at 1061. "The weaker a plaintiff's showing with respect to minimum contacts, 'the less a defendant need show in terms of unreasonableness to defeat jurisdiction.'" *Dental Dynamics*, 946 F.3d at 1229 (quoting *AST Sports Sci.*, 514 F.3d at 1061).

**B. Transfer**

A court may *sua sponte* cure jurisdictional and venue defects by transferring a suit under the federal transfer statutes, 28 U.S.C. §§ 1406(a) and 1631, when it is in the interests of justice. *Trujillo v. Williams*, 465 F.3d 1210, 1222 (10th Cir. 2006). Section 1631 states:

> Whenever a civil action is filed in a court . . . and that court finds that there is a want of jurisdiction, the court shall, if it is in the interest of justice, transfer such

>action or appeal to any other such court . . . in which the action or appeal could have been brought at the time it was filed or noticed, and the action or appeal shall proceed as if it had been filed in or noticed for the court to which it is transferred on the date upon which it was actually filed in or noticed for the court from which it is transferred.

28 U.S.C. § 1631. "Although both § 1406(a) and § 1631 contain the word 'shall,' [the Tenth Circuit has] interpreted the phrase 'if it is in the interest of justice' to grant the district court discretion in making a decision to transfer an action or instead to dismiss the action without prejudice." *Trujillo*, 465 F.3d at 1222–23 (citing *United States v. Botefuhr*, 309 F.3d 1263, 1274 n.8 (10th Cir. 2002)). The factors warranting transfer rather than dismissal under § 1631 include "finding that the new action would be time barred," "that the claims are likely to have merit," and "that the original action was filed in good faith . . . ." *Id.* at 1223 n.16.

### III. Legal Analysis

#### A. Personal Jurisdiction

White Buffalo concedes that the defendants do not maintain continuous and systematic general business contacts with Oklahoma to an extent that would grant this court general personal jurisdiction over the defendants. [Doc. 12, pp. 5–6]. Instead, personal jurisdiction must be based on specific personal jurisdiction arising out of the conduct at issue in this case. In other words, White Buffalo must allege that the defendants "purposefully directed [their] activities at residents of" Oklahoma and, further, that this suit "results from alleged injures that arise out of or relate to those activities." *Benton*, 375 F.3d at 1075; *see also Walden*, 571 U.S. at 286 ("These same principles apply when intentional torts are involved. . . . A forum State's exercise of jurisdiction over an out-of-state intentional tortfeasor must be based on intentional conduct by the defendant that creates the necessary contacts with the forum.").

"In tort-based lawsuits such as this one, 'purposeful direction' has three elements: '(a) an intentional action . . . that was (b) expressly aimed at the forum state . . . with (c) knowledge that

the brunt of the injury would be felt in the forum state . . . ." *Newsome*, 722 F.3d at 1264–65 (quoting *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1072 (10th Cir. 2008)). The "aim of 'purposeful direction' doctrine" is "to ensure that an out-of-state defendant is not bound to appear to account for merely 'random, fortuitous, or attenuated contacts' with the forum state." *GCIU-Employer Ret. Fund v. Coleridge Fine Arts*, 808 F. App'x 655, 663 (10th Cir. 2020) (quoting *Dudnikov*, 514 F.3d at 1071).

"Aside from purposeful direction, the specific personal jurisdiction test requires 'the plaintiff's injuries [to] arise out of defendant's forum-related activities.'" *Newsome*, 722 F.3d at 1269 (quoting *Dudnikov*, 514 F.3d at 1071). The Tenth Circuit has outlined two potential tests— the but-for test and the proximate cause test—to determine this third prong:

> Under the [but-for] approach, any event in the causal chain leading to the plaintiff's injury is sufficiently related to the claim to support the exercise of specific jurisdiction. The [proximate cause] approach, by contrast, is considerably more restrictive and calls for courts to examine whether any of the defendant's contacts with the forum are relevant to the merits of the plaintiff's claim.

*Id.* at 1269–70 (quoting *Dudnikov*, 514 F.3d at 1078). In this context, either test is appropriate. *Id.* at 1270 (citing *Dudnikov*, 514 F.3d at 1079). "[D]espite their differences, both approaches require a 'true causal element' between a defendant's forum contacts and a plaintiff's claim." *Cagle v. Rexon Indus. Corp.*, No. CIV-18-1209-R, 2019 WL 1960360, at *5 (W.D. Okla. May 2, 2019) (quoting *Shrader v. Biddinger*, 633 F.3d 1235, 1246 n.8 (10th Cir. 2011)).

1. Gladden

The court will focus first on Gladden, as her contacts with Oklahoma are more extensive than those of the other defendants. If she has not established minimum contacts with Oklahoma, it is unlikely the others have, rendering any consideration of a conspiracy theory of personal jurisdiction unnecessary. *See Newsome*, 722 F.3d at 1266 ("[P]ersonal jurisdiction requirements 'must be met as to each defendant.'" (quoting *Rush v. Savchuk*, 444 U.S. 320, 332 (1980)). If

8

Gladden has established minimum contacts, the court will consider the other defendants' contacts, as well as White Buffalo's proffered conspiracy theory of jurisdiction.

In support of jurisdiction, White Buffalo submits an affidavit completed by McFarlin detailing Gladden's connections with Oklahoma. [Doc. 12-1]. McFarlin states the following:

> 3. In January 2019, Gladden traveled to Oklahoma City, Oklahoma with her husband, who was employed by Devon Energy, for him to attend a conference Devon Energy held for some of its employees.
>
> 4. Devon Energy was a customer of White Buffalo's Hobbs Office.
>
> 5. During Gladden's time in Oklahoma City in January 2019, I traveled from Tulsa to Oklahoma City to meet with Gladden during the day at a restaurant in her hotel to discuss White Buffalo business matters.
>
> 6. During Gladden's time in Oklahoma City in January 2019, she made extensive use of her White Buffalo issued credit card to purchase items for use in White Buffalo's Hobbs Office, and to purchase various meals and entertainment.
>
> 7. For one day when Gladden was in Oklahoma City in January 2019, she traveled to Tulsa with a friend to meet with me and discuss White Buffalo business matters. She was also introduced to headquarters' staff she regularly worked with and I took her and the entire office out to lunch at a local restaurant. We then toured various sites around Tulsa, including The Gathering Place.
>
> 8. As part of her duties, Gladden regularly submitted electronic reports and information to White Buffalo's headquarters, communicated via email with headquarters' personnel, and had access to the commercial checking account for the Hobbs Office, which was located at Security Bank in Tulsa, Oklahoma.

[Doc. 12-1, pp. 1–2 ¶¶ 3–8]. The court will accept these allegations as true and resolve any factual disputes with the defendants' affidavits in favor of White Buffalo. *Intercon*, 205 F.3d at 1247.

The intentional action element of "purposeful direction" requires little discussion. White Buffalo alleges that the defendants intentionally conspired to move White Buffalo's business to Hungry Horse. Accordingly, White Buffalo satisfies the intentional action requirement. *See Newsome*, 722 F.3d at 1268 (finding that "[t]he intentional action element require[d] little

9

discussion" where "[t]he record contain[ed] no suggestion that the individual defendants acted unintentionally when they took the steps that allegedly led to Mahalo USA's failure").

"The express aiming element requires Oklahoma to have been the 'focal point' of the tort." *Id.* (quoting *Dudnikov*, 514 F.3d at 1074). "The Tenth Circuit has taken a 'somewhat more restrictive approach' to this element, holding that the forum state itself—and not merely a known resident of the forum state—must be the focal point of a defendant's actions." *Rudolph v. Cunningham*, No. 2:13-CV-00181-ABJ, 2015 WL 1507026, at *6 (D. Wyo. Mar. 31, 2015) (citing *Dudnikov*, 514 F.3d at 1075 n. 9). "[K]nowledge of an alleged victim's out-of-state status, standing alone, cannot confer personal jurisdiction over a defendant engaging in allegedly tortious activity." *Dental Dynamics*, 946 F.3d at 1231 (citing *Walden*, 571 U.S. at 282–83). After considering the Tenth Circuit's guidance, the court finds that White Buffalo fails to satisfactorily allege that Gladden's actions were "expressly aimed" at Oklahoma, even when taking its allegations as true.

While White Buffalo has outlined the trip Gladden took to Oklahoma in 2019 in detail, and the trip included business activities, it has not alleged how this case relates to that trip. That trip occurred five to six months before the specific conspiratorial acts alleged in the Complaint began, and no connection is alleged between the trip and the alleged conspiracy. *See AgJunction LLC v. Agrian Inc.*, No. 14-CV-2069-DDC-KGS, 2014 WL 3361728, *7 (D. Kan. July 9, 2014) (finding that, post-*Walden*, contacts such as communications and forum state visits must be linked to the "specific activities" in the suit); *Edelman Fin. Engines, LLC v. Gutowksi*, No. 20-2144-JTM, 2020 WL 6157867, at *2 (D. Kan. Oct. 21, 2020) (finding that business-related trips to Kansas four years before the dispute at issue were not related to the activities of the case, especially where no work on behalf of any clients occurred in Kansas); *ConocoPhillips Co. v. Jump Oil Co.*, 948 F. Supp. 2d 1272, 1281 (N.D. Okla. 2013) (finding the defendant's trips and e-mails to Oklahoma six

years after the personal guaranties in dispute were issued to not be related to the activities of the case). Therefore, the remaining allegations that might provide sufficient minimum contacts are the fact that Gladden knew she was dealing with an Oklahoma company, her communications and reporting with White Buffalo (some of which occurred during the alleged conspiracy), and the White Buffalo bank account in Oklahoma.

Even with these allegations, there are important differences between this case and other cases where the facts supported personal jurisdiction over a defendant. Although Gladden knew she was dealing with an Oklahoma company, she joined White Buffalo through *White Buffalo's outreach in Odessa, Texas*, which then blossomed into *a New Mexico opportunity*. *See AgJunction*, 2014 WL 3361728, *7 (noting that "employment alone [does not] establish[] jurisdiction in the state where the employer is headquartered"). Further, even though Gladden likely knew White Buffalo would suffer in Oklahoma from her actions, the Supreme Court has made clear that foreseeability of harm in the forum state alone is insufficient.² *See Walden*, 571 U.S. at 285 ("[T]he plaintiff cannot be the only link between the defendant and the forum."); *Dental Dynamics*, 946 F.3d at 1231 ("[K]nowledge of an alleged victim's out-of-state status, standing alone, cannot confer personal jurisdiction over a defendant engaging in allegedly tortious activity."); *AgJunction*, 2014 WL 3361728, *6 (finding that the argument that the court could "exercise personal jurisdiction over Defendants simply because they could foresee that their conduct would harm AgJunction in [the forum state]" was foreclosed by *Walden*). Moreover, her actions during the conspiracy *occurred in New Mexico*; she plotted with her staff in the Hobbs office and otherwise

---

² Although foreseeability of harm appears to most directly affect the third element of the "purposeful direction" inquiry—knowledge that the brunt of the injury would be felt in the forum state—courts also consider it when analyzing the second element. *See AgJunction*, 2014 WL 3361728, *6.

took or destroyed White Buffalo property there, and there are no allegations that any of the clients were based in Oklahoma. *Cf. Calder*, 465 U.S. at 787 n.6, 788–90 (holding that the defendant's contacts with California were sufficient to establish minimum contacts because the allegedly libelous publication *reported activities in California*, most of the harm or "effects" to the plaintiff's reputation and career occurred in California, and the defendant's intentional tortious actions were "*aimed at California*").

Gladden's communications with White Buffalo during the course of the conspiracy are also insufficient because they were directed *at the plaintiff, not at Oklahoma*. *See Ron v. Zavitsanos*, No. 2:19-CV-00979-DAK, 2020 WL 1862840, at *6 (D. Utah Apr. 14, 2020) (finding that the plaintiffs failed to sufficiently allege the express aiming element where the defendants sent the plaintiffs in Utah numerous communications containing "fraudulent omissions" because "those actions were directed at the Plaintiffs, not Utah"); *Dental Dynamics*, 946 F.3d at 1232 ("Dental Dynamics fails to show [the defendant] had any connections with Oklahoma outside of the allegedly fraudulent misrepresentations and isolated incidents of outreach to Dental Dynamics. These communications into the forum-state are insufficient to establish [that the defendant] 'expressly aimed' his allegedly tortious misrepresentations at Oklahoma."). Gladden sent emails to or otherwise communicated with McFarlin, who could have been anywhere. And a significant portion of the communication between Gladden and McFarlin as it relates to the conspiracy actually occurred *in New Mexico* when McFarlin traveled there in June. Finally, the company bank account in Oklahoma is insufficient as it is a White Buffalo bank account, and Oklahoma is their principal place of business; Gladden did not purposefully set up an Oklahoma bank account for herself. [Doc. 7-2, p. 2 ¶ 3 (Gladden testifying that she does not "possess a bank account in Oklahoma"); *see Wilson v. Virtual Benefits Grp. Inc.*, No. CIV-19-335-D, 2020 WL 913281, at *6

(W.D. Okla. Feb. 25, 2020) (rejecting the plaintiff's argument that an Oklahoma bank account provided personal jurisdiction as the banking transactions "occurred in Oklahoma solely because it was Plaintiff's banking location," meaning "the only contacts with Oklahoma occurred because Plaintiff and his employee happened to be located" in Oklahoma). Therefore, White Buffalo has failed to allege the necessary second element of the purposeful direction inquiry.

Regarding the last element, "where the first two 'purposeful direction' elements exist, 'it is a fair inference that the individual defendant[ ] knew that the brunt of any injury to [plaintiff] would be felt in [the forum].'" *JCM 082763, LLC v. Deterding*, No. 15-1167-EFM-GLR, 2016 WL 234158, at *5 (D. Kan. Jan. 20, 2016) (alterations in original) (quoting *Newsome*, 722 F.3d at 1269). "The Tenth Circuit has analyzed this element and found that the 'brunt of injury' element was met where the plaintiffs' businesses were located in the forum state and defendants knew that that their actions would affect the plaintiffs' businesses." *Rudolph v. Cunningham*, No. 2:13-CV-00181-ABJ, 2015 WL 1507026, at *6 (D. Wyo. Mar. 31, 2015) (citing *Dudnikov*, 514 F.3d at 1077; *Newsome*, 722 F.3d at 1269). The defendants argue that White Buffalo was harmed in New Mexico, not in Oklahoma, as that is where it lost its office, clients, and property. White Buffalo has not alleged if any of its stolen clients were in Oklahoma, but White Buffalo has sufficiently alleged that Gladden knew the brunt of the injury would be felt by White Buffalo in Oklahoma as the company lost an office, clients, and property, all of which effect its overall business position. However, as White Buffalo has not adequately alleged the second "purposeful direction" element, this court lacks personal jurisdiction over Gladden here.

2. Remaining Defendants

White Buffalo argues that the court has personal jurisdiction over the remaining defendants due to their conspiracy with Gladden and Hungry Horse. As this court has determined that this

court does not have personal jurisdiction over Gladden, White Buffalo's proffered conspiracy theory of personal jurisdiction must fail. In addition, the Complaint does not contain sufficient facts to establish this court's personal jurisdiction over the remaining defendants. The motion to dismiss is therefore granted as to the remaining defendants.

**B. Transfer**

As the court has found a want of personal jurisdiction, it will transfer the case to the United States District Court for the District of New Mexico. 28 U.S.C. § 1631. In support, the court notes this case "could have been brought [in that court] at the time it was filed . . . ." 28 U.S.C. § 1631. In addition, the court finds "that the claims are likely to have merit" and "that the original action was filed in good faith . . . ." *Trujillo*, 465 F.3d at 1223 n.16. Finally, White Buffalo has requested a transfer should this court not have personal jurisdiction over the defendants, and the defendants have stated that they do not object to White Buffalo's request that the case be transferred rather than dismissed. For all of these reasons, the court will transfer this case.

**IV. Conclusion**

WHEREFORE, defendants' Motion to Dismiss [Doc. 7] is granted. This case is transferred to the United States District Court for the District of New Mexico.

IT IS SO ORDERED this 25th day of February, 2021.

GREGORY K. FRIZZELL
UNITED STATES DISTRICT JUDGE